T.C. Memo. 1997-36

UNITED STATES TAX COURT

THOMAS L. AND LAURA L. GORDON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18186-94.              Filed January 21, 1997.

Thomas L. Gordon and Laura L. Gordon, pro se.

<u>Dwight M. Montgomery</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined a deficiency in
and additions to petitioners' 1986 Federal income tax as follows:

| | Additions to Tax, I.R.C. | | |
| | Sec. | Sec. | Sec. |
| <u>Deficiency</u> | <u>6653(b)(1)(A)</u> | <u>6653(b)(1)(B)</u> | <u>6661(a)</u> |
| $18,246 | $13,685 | [1] | $4,562 |

[1] 50 percent of the interest computed on $18,246 at the time of assessment and/or payment of tax.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues remaining for decision are: (1) Whether petitioners failed to report income from thefts on their 1986 return; (2) whether petitioners are liable for the addition to tax for fraud; and (3) whether petitioners are liable for the addition to tax for substantial understatement of liability.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time their petition was filed, petitioners were husband and wife and resided in San Dimas, California.

Petitioners were married in November 1983. Petitioner Laura L. Gordon (Mrs. Gordon) was married to Alexander P. Sandoval (Sandoval) from 1975 to 1982. Mrs. Gordon received child support payments in bimonthly amounts of $136 during 1985 and 1986 as a result of her divorce from Sandoval.

Petitioners filed a Form 1040, U.S. Individual Income Tax Return, for 1986 showing $42,309 as their adjusted gross income.

Petitioners and the LASD

During 1986, petitioner was employed as a deputy sheriff with the Los Angeles Sheriff's Department (LASD). Petitioner began working for the LASD on August 24, 1970. From April 12, 1981, until November 2, 1986, the LASD assigned petitioner to its Narcotics Bureau. From October 25, 1982, until November 2, 1986, petitioner was assigned to Major Violators Crew II (Majors II), an elite narcotics enforcement team, to investigate money laundering and narcotics trafficking. On November 2, 1986, the LASD promoted petitioner to sergeant, transferred him out of the Narcotics Bureau, and assigned him to the Lakewood station.

During 1986, Mrs. Gordon was not employed. She worked for the LASD from October 28, 1974, until November 4, 1985, the date she retired. On or about December 14, 1985, Mrs. Gordon received a pension check dated December 11, 1985, in the amount of $18,799.26. Petitioner deposited this check into petitioners' account at Chino Valley Bank (Chino).

Eufrasio G. Cortez (Cortez) joined the LASD in July 1975. Cortez was assigned to Majors II from November 1982 until September 1989.

In January 1986, the Majors II team arrested Angel Leon (Leon) and other suspects for trafficking cocaine and laundering money. Majors II seized at least $200,000 in cash.

Petitioner was the investigating officer on the Ernest Montenegro (Montenegro) case. Majors II arrested Montenegro and seized cash.

In April 1986, Majors II arrested Heriberto Martinez (Martinez) and seized cash. Cortez was the investigating officer on the Martinez case.

In September 1986, Majors II, assisted by the local police department, arrested three people and seized cocaine and cash as part of the investigation of Jamie Ramos (Ramos).

In November 1986, Majors II detained suspects and seized cash as part of the investigation of Victor Lopez (Lopez). Petitioner was not a member of Majors II at the time of the Lopez investigation.

Petitioner's Indictment

On August 12, 1992, a Federal Grand Jury charged petitioner in a three-count indictment with violating 18 U.S.C. sec. 1957 (1994) (money laundering), section 7206(1) (willfully false statements on a tax return), and 18 U.S.C. sec. 982(a)(1) (1994) (forfeiture). The indictment charging petitioner with violating section 7206(1) pertained to petitioners' 1986 return. Petitioner's case proceeded to trial in the United States District Court, Central District of California, in April 1993. A jury found petitioner guilty of the charge of violating section 7206(1). A hung jury resulted in a mistrial on the money

laundering charge, and a retrial led to the same result. The civil forfeiture count was settled.

Cortez was also indicted. As part of a plea agreement in his own criminal case, Cortez testified against petitioner in both of petitioner's criminal trials.

## Bank Accounts and Credit Card Accounts

During 1986, petitioners maintained a joint checking account at Security Pacific National Bank (Security), Glendale, California. Petitioner had his LASD paycheck deposited directly into the Security account during 1986. During 1985 and 1986, only petitioners had signatory authority over this account. During 1986, petitioners withdrew $500 from their Security account to purchase a cashier's check and wrote two $100 checks to themselves. Petitioners did not withdraw any cash from this account through an automated teller machine during 1985 or 1986.

During 1986, petitioners maintained a joint checking account at Chino in Pomona, California. Petitioners opened this account in April 1985 and closed it in March 1987. During this period, only petitioners had signatory authority over the Chino account. There were no withdrawals from this account during 1985. During 1986, petitioners did not withdraw any cash from the Chino account through an automated teller machine.

During 1986, petitioner maintained an account at First City Savings Federal Credit Union (the Credit Union), Los Angeles, California. Petitioner opened this account in January 1973.

During 1985 and 1986, petitioner did not withdraw any cash from the Credit Union.

Except for the three accounts set out above, petitioners did not maintain, either jointly or severally, any other bank accounts during 1985 or 1986.

During 1986, petitioners had a MasterCard credit card account at Security. Petitioners received two $100 cash advances from their MasterCard during 1985 and two $100 cash advances from their MasterCard during 1986. Also during 1986, petitioners had a Visa credit card account at Bank Americard Card Center, Pasadena, California.

Construction of Gladstone House

On October 14, 1980, petitioner and a prior spouse purchased vacant land located on Gladstone Street in San Dimas, California, for approximately $22,500. In or about 1981, the City of San Dimas placed a lien in the amount of $11,413 against petitioner's land for street improvements. On December 10, 1982, petitioner received the land as his separate property as part of his divorce settlement with his prior spouse. On January 23, 1985, petitioner paid $2,000 towards the lien with funds from the Credit Union. In January 1986, petitioners commenced construction of a house on the Gladstone property.

From June 1, 1986, until March 31, 1987, petitioners rented an apartment at the Peartree San Dimas Apartments (Peartree) in San Dimas. On May 22, 1986, petitioners paid a cash deposit of

$500 to Peartree.  On June 1, 1986, petitioners made a cash payment of $760 for the first month's rent.  From July 1, 1986, until March 1, 1987, petitioners made their monthly rent payment of $760 by checks drawn on their Security account.

Petitioners completed construction of their house and occupied it in or about March 1987.  On August 31, 1987, petitioners applied for a $50,000 residential loan from First Federal Savings and Loan Association of San Gabriel Valley.  The loan was approved in September 1987.

Cash Deposits During 1986

During 1986, petitioners made the following cash deposits into their Security account:

| Date | Deposited By | Amount | Denominations |
|------|-------------|--------|---------------|
| 02/06/86 | Mrs. Gordon | $   400 | 20 $20 bills |
| 02/21/86 | Mrs. Gordon | 480 | 24 $20 bills |
| 03/03/86 | Petitioner | 2,500 | 25 $100 bills |
| 04/02/86 | Petitioner | 1,500 | 7 $100 bills |
|  |  |  | 6 $50 bills |
|  |  |  | 25 $20 bills |
| 05/02/86 | Petitioner | 800 | 8 $100 bills |
| 06/24/86 | Petitioner | 500 | Unknown |
| 07/03/86 | Mrs. Gordon | 770 | 1 $50 bill |
|  |  |  | 36 $20 bills |
| 07/23/86 | Mrs. Gordon | 800 | 8 $100 bills |
| 08/20/86 | Mrs. Gordon | 400 | 4 $100 bills |
| 10/10/86 | Petitioner | 1,000 | Unknown |
| 11/04/86 | Petitioner | 1,000 | Unknown |
| 12/01/86 | Petitioner | 3,000 | Unknown |
|  | Total | $13,150 |  |

On June 16, 1986, Mrs. Gordon deposited $10,000 cash, made up of 100 $100 bills, into petitioners' Chino account.

Other Sources of Petitioners' Money

Petitioners had known sources of money during 1986 totaling $57,458.31.

Petitioners received additional cash totaling $140 during 1986 from checks written to the grocery store for amounts over the total purchase price.  This money was used for taking the children out to lunch or for similar activities.  In addition, Mrs. Gordon cashed child support checks totaling $1,904 during 1986.

Cash Payments During 1986

During 1986, petitioners made the following purchases with cash:

| Date | Amount | Description |
|---|---|---|
| 02/20/86 | $ 3,164.00 | Lumber |
| 03/07/86 | 5,010.93 | Lumber |
| 04/03/86 | 935.78 | Lumber |
| Unknown | 3,000.00 | Lumber |
| 05/22/86 | 500.00 | Rental deposit |
| 05/22/86 | 4,208.88 | Lumber |
| 07/01/86 | 760.00 | Rent |
| 07/01/86 | 650.00 | Emerson Glass |
| 07/31/86 | 414.78 | City of San Dimas |
| 09/11/86 | 278.92 | Snyder Diamond |
| 09/18/86 | 300.00 | Snyder Diamond |
| 10/23/86 | 338.74 | Snyder Diamond |
| 11/07/86 | 278.93 | Snyder Diamond |
| Unknown | 576.06 | Snyder Diamond |
| 11/10/86 | 414.78 | City of San Dimas |
| Unknown | 1,500.00 | Engineer reports |
| Unknown | 300.00 | Steel |
| Total | $22,631.80 | |

## OPINION

Respondent argues that petitioners underreported their income for 1986 with the intent to evade tax. Petitioners contend that, although they did deposit and expend large amounts of cash during 1986, the income that respondent alleges was unreported was actually cash that petitioners had saved during previous years.

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and for the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of an underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). If respondent establishes that any portion of the underpayment is treated as attributable to fraud, the entire underpayment is treated as attributable to fraud and subject to the 75-percent addition to tax unless the taxpayer establishes that some part of the underpayment is not attributable to fraud. Sec. 6653(b).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be

presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years. Holland v. Commissioner, 348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.

Under section 61, gross income includes "all income from whatever source derived." Gross income includes funds derived from legal and illegal sources. Rutkin v. United States, 343 U.S. 130 (1952). Where a taxpayer keeps no books or records, or fails to file a return from which his income tax liability can be assessed, the Internal Revenue Service (IRS) may reconstruct the taxpayer's income. Sec. 446(b); Moore v. Commissioner, 722 F.2d 193 (5th Cir. 1984), affg. T.C. Memo. 1983-20. The IRS has great latitude in reconstruction methods. Giddio v. Commissioner, 54 T.C. 1530, 1532-1534 (1970). As a general rule, the computation of taxable income is made under the method of accounting regularly employed by the taxpayer or, if no method of accounting has been used by the taxpayer, made under such method as, in the opinion of respondent, clearly reflects income. Sec. 446(b); Moore v. Commissioner, supra; Giddio v. Commissioner, supra.

Initially, respondent determined that petitioner received money from the following sources:

| Case | Amount |
|------|--------|
| Leon | $10,000 |
| Montenegro | 1,000 |
| Martinez | 15,000 |
| Ramos | 20,000 |
| Lopez | 10,000 |
| Total | $56,000 |

Respondent alleges that the testimony of Cortez, along with petitioners' bank records, establishes that petitioners underreported their income in 1986.

At trial, Cortez testified that petitioner received cash from thefts of drug-tainted money during 1986, including the following: $10,000 of stolen cash from the Leon case, $15,000 of stolen cash from the Martinez case, and $10,000 of stolen cash from the Lopez case. In reference to the Montenegro case, Cortez testified that he did not recall whether petitioner kept any of the stolen cash for himself. Cortez stated that he received $1,000 from petitioner and that petitioner, as the investigating officer in the Montenegro case, would have determined the share that the other officers would receive and that petitioner would usually have kept the largest share for himself. Cortez could not place a dollar amount on any money received by petitioner from the Ramos investigation. Cortez testified that he received two bundles of cash, totaling $20,000, and that petitioner received two bundles of cash. His estimate that petitioner

received $20,000 is based on Cortez's counting of his own two bundles.

In this case of illegal unreported income, respondent must establish that the deficiency determination is supported by a proper foundation of substantive evidence. Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Respondent cannot rely on the presumption of correctness of the notice of deficiency and must offer evidence linking the taxpayer to the activity. Id. Cortez's testimony links petitioner to the thefts during 1986, and those thefts provide the likely source for the unreported income that we determine below. See Adamson v. Commissioner, 745 F.2d 541, 547 (9th Cir. 1984), affg. T.C. Memo. 1982-371.

Petitioners argue that Cortez's testimony is not reliable because Cortez is required to testify for the Government under the terms of his plea bargain. Petitioners also point to Cortez's admissions at trial of his falsifying numerous police reports and perjuring himself during prior court appearances. Nonetheless, Cortez's testimony is not improbable, and it is corroborated by the evidence of petitioners' cash deposits and expenditures. In 1986, petitioners made unexplained cash deposits totaling $23,150 and cash expenditures totaling $22,631.80.

Petitioners claim that they had a cash hoard that was the source for cash deposits and expenditures during 1986. They

contend that they deposited money from their cash hoard into their accounts to cover checks written for the building of the house.

Mrs. Gordon claims that she had cash on hand from child support payments, sales of woodcrafts, yard sales, and gifts from her parents. During 1986, Mrs. Gordon cashed child support checks totaling $1,904. As for Mrs. Gordon's other claimed sources, no credible evidence was presented from which we can even estimate an amount of available cash. For example, Mrs. Gordon claimed that she received approximately $1,000 cash from yard sales, but she testified that she could not remember whether or not the money went into her cash hoard. Mrs. Gordon claims that she cannot recall the source of 100 $100 bills deposited by her on June 16, 1986. It is not credible that Mrs. Gordon could not remember the source of $10,000 cash, particularly in that form.

Petitioner claims that the sources of his cash hoard were cash from his father, the sale of a car, and real estate sales. Petitioner testified that his father paid for the lumber purchased during 1986 for the Gladstone house. Petitioner's testimony, however, was contradicted by testimony from a cashier at the lumberyard who remembered petitioner's making the purchases. Petitioner provided no evidence of any car sale other than a receipt that shows that petitioner purchased, not sold, a car. The real estate sales that petitioner claims provided cash

for his hoard occurred sometime before 1982. Petitioner produced canceled checks that purportedly represent moneys from real estate sales. However, several of the checks appear to have been deposited into petitioner's bank accounts, and no evidence of any withdrawal of cash from these accounts was presented. Petitioners failed to call any witnesses to corroborate any of the alleged cash sales.

Petitioners' testimony was marked by "selective memories" and otherwise was not credible. We therefore reject the testimony of petitioners as to the existence of a cash hoard.

For purposes of the fraud addition to tax, respondent has met her burden of proving this underpayment of tax by clear and convincing evidence by showing a likely source for the cash deposits and cash expenditures, i.e., the thefts, and by negating petitioners' claimed nontaxable sources, i.e., the cash hoard. See United States v. Massei, 355 U.S. 595 (1958); Holland v. United States, 348 U.S. 121, 137 (1954).

Respondent must also prove fraudulent intent. Petitioner's conviction under section 7206(1) does not collaterally estop petitioner from disputing the addition to tax under section 6653(b). Wright v. Commissioner, 84 T.C. 636, 643 (1985). Respondent's burden with respect to fraudulent intent is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v.

Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including an understatement of income, dealings in cash, and implausible or inconsistent explanations of behavior.  Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988).

The record in this case is replete with evidence of petitioners' fraudulent intent.  Petitioners understated their income in 1986.  They deposited large amounts of cash and made large expenditures of cash.  Moreover, petitioners' explanation of the source of the cash deposits and cash payments is implausible; their claims of a cash hoard and other trial testimony are unsupported and not worthy of belief.

Respondent has proven by clear and convincing evidence an underpayment of tax due to fraud for 1986.  Petitioners have not proven that the amount determined by respondent is incorrect or that any part of the underpayment is not attributable to fraud. See sec. 6653(b)(2).

Petitioners contend that we should consider the constitutional concept of double jeopardy in reaching our decision regarding the fraud addition to tax.  The Fifth Amendment to the Constitution provides in part:  "No person shall * * * for the same offence * * * be twice put in jeopardy of life

or limb".  In <u>Helvering v. Mitchell</u>, 303 U.S. 391, 399-404

(1938), the United States Supreme Court stated:

> Congress may impose both a criminal and a civil
> sanction in respect to the same act or omission; for
> the double jeopardy clause prohibits merely punishing
> twice, or attempting a second time to punish
> criminally, for the same offense.  The question for
> decision is thus whether section 293(b) [the
> predecessor of section 6653(b)] imposes a criminal
> sanction.  That question is one of statutory
> construction.  * * *
>
> *     *     *     *     *     *     *
>
> The remedial character of sanctions imposing additions
> to tax has been made clear by this Court in passing
> upon similar legislation.  They are provided primarily
> as a safeguard for the protection of the revenue and to
> reimburse the Government for the heavy expense of
> investigation and the loss resulting from the
> taxpayer's fraud.  * * *  [Citations and fn. ref.
> omitted.]

See <u>Ianniello v. Commissioner</u>, 98 T.C. 165, 176-185 (1992).  The

imposition of the addition to tax for fraud is not barred by

double jeopardy.

Respondent also determined that petitioners are liable for

the section 6661 addition to tax for 1986.  Petitioners bear the

burden of proving that respondent's determination is not correct.

Rule 142(a); <u>Cluck v. Commissioner</u>, 105 T.C. 324, 339 (1995).

Section 6661(a) provides for an addition to tax on underpayments

attributable to a substantial understatement of income tax.

Section 6661(b)(2)(A) defines the term "understatement" as being

the excess of the amount of tax required to be shown on the

return for the taxable year over the amount shown on the return.

An understatement is substantial if it exceeds the greater of

10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1)(A). The deficiency in tax we have determined represents a substantial understatement.

Under the facts established in the record, petitioners are liable for the addition to tax under section 6661 for 1986.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.